Thank you, Your Honor, and may it please the Court, my name is Andrew Jackala. I represent the appellants Anoka County and Sheriff James Stewart. This case includes what Anoka County contends are three errors on the part of the district court that span the course of this case. The first error that Anoka County cites is the district court's holding at summary judgment that the underlying jail policy violates the Equal Protection Clause of the United States Constitution. Anoka County contends that this holding was in error because there are substantial differences between the classification groups that are at issue and in any event the policy would survive strict scrutiny. Moving on to... Why, you know, on that point, why not just have a policy kind of like the State of Minnesota's or even one that just says, like the one in Arizona, that if you have reason to believe that someone is not a citizen of the United States, the officer in question can call the ICE? Yes, Your Honor, and that is something that is addressed in the Arizona case. But what we're talking about here are a couple of complications. The first one being that there is a federal law out there that proscribes jails from asking questions about citizenship. It's cited in our brief, and the federal law states that there can be no investigation conducted into the lawful status of individuals without some type of, some degree of cause or suspicion. And when we're talking about situations in a jail, as we're talking about in this case, we have employees who are not necessarily trained law enforcement officers. We have people who are sworn peace officers under the law. That's true, but everyone knows what reasonable suspicion is, I presume, because you have to apply it every day. So if you labeled it in terms of reasonable suspicion, I can't understand why officers couldn't follow a rule like the one in the Arizona case or the one like the State of Minnesota has. It has to do, to a certain degree, with the quantity of people rotating through the jail on a daily basis. The Noca County Jail, as information in the record shows, is a very busy public jail. I assume there are busy jails in Arizona, too, so I don't know that that addresses Judge Strass' question. I mean, it's just a different policy and procedure that the county could have put in place. To an extent, I think there's a fundamental difference that we're missing here. We're talking about, in the context of the Arizona case, we're talking about two different standards that had applied. And we have the one which I would characterize more as being the roadside-type stop, where there is a degree of suspicion that's required. But the Arizona law also contained a provision that was identical to basically what's happening at the Noca County Jail, where they say, as a matter of course, that there will be these status checks that are conducted prior to or during the course of a booking procedure at the jail. But they didn't say, and this is the problem I'm having, they didn't say, you know, if the person wasn't born in the United States, born elsewhere, you have to hold them longer. I didn't see that in the Arizona law. If you can point me to where that was in the Arizona law, let me know, but I don't see that in the Arizona law. No, and that's precisely the point. And nor does the Noca County Jail hold anybody any longer. There's a wealth of evidence in the record that jail administrators and the detention deputies are taught and put into practice that if somebody's time at the jail has come to an end before the jail receives any type of response from ICE, these inmates are let go. They are not held a minute longer than their state time would require them to be held in order to get a response from ICE. So it's not as though anybody is being held longer for purposes of some type of immigration hold here. And perhaps I deviated from the focus of your question, Your Honor. Could you remind me? No, I think you've answered it in the course, yeah. You can move on if you want to talk about false imprisonment or whatever your next point was. Okay. I was going to ask you, in order for us to know what level of scrutiny to apply, we need to know whether we're dealing with a protected class. Do you know whether there's any precedent from an appellate-level court addressing whether the term national origin encompasses foreign-born persons generally or whether it's only referring to specific nationalities? Well, Your Honor, that's a point that I attempted to articulate at the district court. And the district court obviously held that national origin is some very broad term that can encompass anybody born outside the United States. I disagree with that position, and I continue to do so. I think when you're talking about national origin discrimination, you're talking about discrimination that's based on somebody's nationality, not somebody's lack of nationality. And perhaps that gets to your point, Your Honor. The — if the jail had a policy, for instance, that required any type — that required a referral to ICE for anybody born in a certain country, like Mexico, Guatemala, Honduras, in my mind, that would be national origin discrimination. And at the district court level, the — one of the problems we encountered on the summary judgment level, on the summary judgment motion, was that we had this moving target that was being set up in the complaint. The equal protection claim as stated in the complaint had a host of different — different classifications that plaintiffs cited as being discriminatory. There's references to race. There's references to ethnicity. There's references to national origin. There's references to Hispanic individuals. So we were really trying to hit a moving target at the summary judgment level. And the one that I came down to and argued most forcefully was this idea of alienage. And the notion that — the definition of an alien would be somebody who's not from this country, somebody not born in this country. And that seemed to be the most applicable fit when looking at a policy that applies to people who were born outside of this country. Let me ask you this. If we — if we conclude, and I'm asking you to assume for the purpose that you — I know — I know Anoka disagrees with this, but strict scrutiny applies. Do you at least agree that it's over and the policy is over and under-inclusive? And here's what I mean by that. It would — it would — it would, you know, sweep up a lot of U.S. citizens that were born elsewhere, Arnold Schwarzenegger, a host of people who are clearly citizens. I mean — and then it would also fail to catch people who have renounced their citizenship. So they might have been born here but wanted to — wanted to have Switzerland or whatever be their — so, I mean, from that point of view, isn't it — doesn't it necessarily fail narrow tailoring if we get there? I would agree and disagree, Your Honor. I would agree that the policy does have over-inclusive and under-inclusive traits. I don't think that can be disputed based on the way that it's applied. But merely having an imperfect policy does not equate to having an unconstitutional policy. And I cited a number of provisions from precedent from this Court and the Supreme Court in my brief that speak to that point, that there is — the standard is not perfection. Yes, there may be the children of diplomats who were born in this country who might escape the — the reach of this policy. But, again, what we have to remember is that this policy is a voluntary effort of a law enforcement agency trying to cooperate with ICE. It's not — the standard is not perfection either in the application of the policy or in — in ferreting out every person's who may have been in this country illegal who made it through the Anoka County Jail. That's — that's not what we're talking about here. We're talking about one local law enforcement agency that's trying to play its role at a larger scale and assist ICE in what the Supreme Court calls a very important aspect of the federal immigration system. I wanted to let you move on to false imprisonment. And I may have questions along the way, but I think that actually is maybe the better issue for Anoka. And I'd be happy to do that. One thing that I — that I do want to point out, the final point I'd make with respect to the equal — or equal protection claim is that the Grutter decision, the Grutter v. Bollinger decision, asks — informs courts to look at relevant differences in context when we're weighing equal protection claim. And relevant differences, I — I think it's just glaring at us in — in this case because we have one group that is subject to immigration laws on the whole and one group that's not. And I — I think that can be the holding in this case, is that we have these important distinctions between the two classifications. And equal protection law clearly provides that it's not a violation of the Constitution to treat dissimilar groups differently. On false imprisonment, I'm just going to direct you to what I'm interested in, which is statutory immunity, first of all. There's a — there's a strange line of cases in Minnesota that talks about that the government has to present evidence that this is a planning-level decision. And I just want to ask if there's any evidence in the record whatsoever from Anoka showing how the decision was made.  I — I can't come up with anything right off the top of my head. We do have evidence, Your Honor, that talks about some of the decision-making that went into the — into the policy. And that you could find in the sheriff's response to requests for admissions. There's deposition testimony from the jail commander, David Paschal. But I think, Your Honor, the most important thing when — when we're talking about the statutory immunity question is what the two options that — that we have here when — when we're considering statutory immunity. Because it seems to me inherently contradictory what the district court reached in this case, that on the one hand, statutory immunity does not apply because we're not talking about high-level policy decisions. We're talking about the implementation of that policy by the jailers at — at really a low level within the jail. But at the same time, and I think is something that can't be squared, is that the district court found that there's a direct liability cause of action here. That, first of all, there's a direct liability claim that's contained within the complaint, but also a direct liability cause of action. So for the district court to say, on the one hand, statutory immunity would not apply because we're talking about the actions of jailers. But there's a direct liability claim, not a vicarious liability claim, because of the policy that's in place that the county itself put into place. I understand that argument. But what were — if you know the reasons, and I don't want you to go outside the record, what were the reasons for the policy, the particular policy that's at issue here? Why did — how and why did ANOCA — is there — try to point me to something as to how and why they — they reached this decision. Yeah. And you can find that in the sheriff's response to Ann's request for admission. The sheriff said this is a matter of maintaining good relations with law enforcement. Not only that, but it fosters a much more productive law enforcement environment within the county, not only for the interagency cooperation, but also at the core level within the sheriff's office itself. Okay. I have one more. It's actually kind of a double question, but it's about whether you raised this. Did you raise any problems with the jury instruction on false imprisonment? And the other point is — answer that point first, and I'll think of my other one. Yeah. You know, Your Honor, with the way that this came down, it was — we didn't have that much of an opportunity to raise problems with the jury instructions. And the reason that is, is we brought this motion mid-trial. And the judge denied our Rule 50A motion at trial, saying that he was going to let the case go to the jury. And at that point, we had a choice that we could sit there and we could re-litigate the same questions that we had just raised on the Rule 50 motion in the context of jury instructions. So the answer, it sounds like, is no, then? I mean, you didn't really raise a jury instruction issue, right? It's fine if you didn't. I just want to know the answer to it. No. No. Okay. And then the other question I had was, you talk about logical inconsistency, and there is actually a logical inconsistency in the verdict here, which is that the jury awarded nominal damages on the equal protection claim, but $25,000 or $30,000 — I can't remember. It was five digits, but it was right in the $25,000 range. On the other one, false imprisonment claim, I don't know how that works, given that the premise of the false imprisonment claim was the equal protection violation or the policy, but you're not challenging the logical inconsistency of the verdicts in that way? In that way, no. Okay. And one thing that I think is important to recognize is that the only place in the special verdict form where the ICE policy is specifically mentioned is with respect to the equal protection claim. It's not mentioned with respect to the false imprisonment claim. Okay. Mr. Jockley, your time has expired, but I'll give you two minutes before we vote. Thank you, Your Honor. Mr. Bratley, you may proceed. Thank you. Thank you, Your Honors. If it may please the Court, my name is Ian Bratley on behalf of Ms. Prada. This case is about Anoka County, a county that's gone rogue, essentially. They've adopted an unconstitutional, unwritten policy that no one, including ICE, asked for and that no one, including ICE, needed. This Court should affirm summary judgment on Ms. Prada's equal protection claim because Anoka's unwritten policy discriminated on the basis of national origin and was not narrowly tailored to a compelling state interest. This Court should also affirm the judge's denial of Anoka County's Rule 50B motion because Ms. Prada pled a false imprisonment claim against Anoka County. Anoka County consented to that claim, and Anoka County was not eligible for any immunities under Minnesota law. Lastly, this Court should affirm the attorney fees in this case as Ms. Prada was the prevailing party under Farrar and Jones v. Lockhart. I'm just going to jump right in. Sure. The statutory immunity. You heard me talk to opposing counsel. I have some thoughts on that and the consistency with the verdict on the equal protection, but is there any evidence that you know of at the record either way that shows how Anoka County formed this decision, who made it, and why they made it? No, Your Honor, and this was a specific line of inquiry during our depositions of Commander Patchell. He was designated as their 30B6 witness on this topic. We talked with him because we were concerned there might be immunity claims, so we wanted to make sure we had an idea of the planning level, and Mr. Patchell, Commander Patchell, I apologize, testified that he did not know why the policy was adopted. He didn't know when it was adopted, and he didn't know the reasons for it being adopted. I don't have a citation to the deposition record before me to give you that answer, but if the court wants me to later, I could cite, I could submit something that shows you where in the transcripts of the deposition testimony this happened. I think that would be helpful maybe in a Rule 28 J letter or something. Let me just ask you now theoretically whether that Minnesota line of cases applies, and I'll tell you why I'm having problems, and it's not necessarily an argument directly made by the opposing party, but I think it's a way to reconcile what the jury did in this case. So on the one hand, you have a Monell claim that's an official policy or custom, and the jury said, yeah, there was an official policy or custom. On the other hand, in statutory immunity, you're trying to ask, is this a planning level decision, and what makes this case different is there is a general written policy that says we don't do this, and then there is an unwritten policy that says here's what we do, and I wonder whether that makes it different from all that other line of Minnesota cases in making that a planning level decision, because this is clearly not administrative. It seems it's got to be planning level if you're disregarding a written policy. Do you understand what I'm saying? I do, and I have several thoughts on that. First off, you're correct. They have a written policy that says you can't do this. This is a violation. We don't discriminate on the basis of national origin. So that they have a written policy and an unwritten policy, contradict each other. Immunity law generally does not reward a party for having conflicting and allowing them to, you know, violate the Constitution. So that would be the first thought on that. But the second thought is that for statutory immunity, we look at the conduct that is at issue, and Judge Thunheim correctly noted that the conduct was the release of, in this case, Ms. Prada from the jail. And I would cite to another case, Esparza v. Nobles County, that's in the docket at 165, page 11, where the court in Planned Parenthood, Minnesota, statutory immunity law, pointed out that release of an individual is not, and I apologize. I have the case right in front of me. The decision involved to release someone from custody who is titled to be released from custody. No discretion is allowed or allowed, is involved or allowed. As it relates to public officials, the release of an inmate required to be released is no matter that legitimate reason, no matter the reason of incarceration, is merely a ministerial duty. It must occur. But doesn't that go to discretionary function immunity, which is different under Minnesota law? I'm talking more of, is it a, you could still have an unconstitutional planning level decision, I think, and have statutory immunity. So for, as Judge Thunheim ruled on statutory immunity, which is what is in front of this court, he moved it away from the planning level. It didn't matter the planning level because the conduct that led to the unconstitutional detention was whether or not she was released. And that is the first question in statutory immunity, is you look at the exact conduct at question. And that's the conduct the jury found, the jury instructions indicated to them to look to. So there would be no statutory immunity for not releasing a person who is entitled to be released. Should Judge Thunheim have looked to the planning level question, do you think? I mean, I'm not sure that, I'm not sure, what's your best Minnesota case in support of that particular point? Would it be the one you just read, the Esparza case? I think Esparza and then as well the Gleason v. Metro Transit, which is another false imprisonment case. In the Gleason case, the court, and I think it talked about both official and statutory immunity, so I might have the quote out of context, but I don't think I do. But it reminds that statutory immunity is not something that we permit for discriminatory reasons. So when we're doing something wrong, which they were, we're not going to give you these immunities. That's not what they're meant for. So hopefully that answers your question. It does. Thank you. Thank you, Your Honor. Your Honors, I do want to point out one thing before I get into a longer discussion. In its reply brief on page 26, Anoka County sort of misstates Minnesota law, and we wanted to make sure we corrected that. They insinuate that for official immunity, you need to have an individual defendant, and then they argue that that is why they didn't make an official immunity claim in this case. So as an initial point, that's a strong admission. They did not make an official immunity claim. Judge Thunheim was correct to find that. But the case law in Minnesota does not require an individual defendant to make an official immunity claim. And just one case is Cairn Army v. City of Rockford, 882 Northwest 2nd, at 600 and at note 10. That case collects a lot of other cases under Minnesota law that say we don't need individual defendants to show, to claim official immunity. So when Anoka County has essentially tried to, when Anoka County didn't make their official immunity claim, it wasn't because we didn't have an individual defendant, it was because they were misunderstanding Minnesota law on official immunity. So that's the point I wanted to make in their reply brief. Moving on to strict scrutiny analysis of this policy. Let me ask you a kind of foundational question on that. So what do you think the best guidance is from the Supreme Court on this issue? Is it Espinoza or is it Graham or is there another case that tells us the limits of national origin? And whether we're talking about discrimination on the basis of a specific nationality or more general? So, Your Honor, for national origin discrimination, I'd start with I think the case we cited was City of Claiborne, a 1985 decision. And then I believe in that section, and I don't have it in front of me, we cited several cases. I think Espinoza was one of them, but I don't have it off the top of my head. The idea that national origin needs to specify a certain country, say Mexico. Espinoza seems to support that view, but Graham seems to support a broader view. Right. And I apologize, I don't have the cases in front of me, so I don't remember which is which. But the idea that the courts would allow a government entity to discriminate against, and again, when we step back and we look at this as a realistic world, most of the people impacted by national origin discrimination at Anoka County are going to be from Latin America, just because of how Minnesota is populated. That's from our census data. That may be true, but that's not necessarily a constitutionally-based distinction. Generally, the courts try to avoid letting a government get away with one in this case. So I would, again, I can't remember if it's Graham or Espinoza, I apologize. But one of those cases suggests, and it is in our brief, that national origin does not require country-specific. It is just the concept. And as Anoka County's policy points out, you know, it's the fact that a person is born outside the country that is controlling, and that is national origin discrimination under city of Claiborne. And Claiborne said, when a statute classifies by national origin, it is generally so seldom relevant to any legitimate state interest, and it is a view that those burdened by national origin are not worthy of deserving protection. So generally, the courts seem to have a wider view of national origin, and again, either the grammar as far as the case that we cite. Would you agree, counsel, wouldn't you, that status as in what the law calls an illegal alien is not a protected class? Yes, Your Honor. I would, well, I want to step back. There is no classification of an illegal alien. There are undocumented aliens. Those are individuals who have crossed over the border without permission. There are overstays. Those are people who have made a legal entry into the United States and overstayed. There is no such thing as an illegal alien under immigration law. If just as a point of view. So if this classification system was aimed at alienage or immigration status, there might be an argument that a lower standard is needed or could be applied. But Anoka County has not met that burden. They have based this solely on national origin. So have you given thought to the State of Minnesota's brief and the amicus brief, and would that, State of Minnesota seems to suggest that that might well be constitutional. Do you agree, or do you differ with the State on that? I generally agree with the State's, the Attorney General's brief on this case. I think they cited to one statute where, under Minnesota law, where if somebody has a felony conviction or is a, yeah, I think it's a felony conviction, under Minnesota law you would reach out to federal immigration officials. And, again, that seems, that would probably be constitutional. I'm sorry, Your Honor, did I answer your question? No, you did. Okay, thank you. Your Honors, I only have a few moments left of my time. Are there topics you would like me to discuss? You know, one other quick point, I hate to monopolize things, but the false imprisonment claim, one last question. You make the argument that there is a cause of action. Is most of that against the county? Yep. I should premise that. Is most of that based on the language of the Tort Claims Act in Minnesota and the fact that it recognizes that the county can be sued for committing torts? Yeah, so, exactly. So I believe that's Statute 44602, as well as several cases out of both the District Court, the Federal District Court of Minnesota, which was Oriana v. Nobles County, which found direct liability against Nobles County for false imprisonment, and then the Esparza case as well, which was a state court case that also found, again, under Minnesota tort law, that a municipality could be liable under the law. And I would point out both of those cases have been highlighted significantly in this case. In Docket Entry 37, Judge Thunheim had denied a motion to dismiss. The case he relied most upon to deny that motion to dismiss was the Oriana case. So clearly the parties were aware of Oriana, and they were aware that a county could be directly liable under the Minnesota Tort Act under Oriana. Thank you. Thank you, Your Honors. I appreciate your time. Mr. Jackley, you may proceed with rebuttal. Thank you, Your Honor. One point I would like to follow up on is a point that Judge Gross, you made with opposing counsel, and that's this idea of national origin versus alien edge. And we spent a good deal of time talking about this in response to the plaintiff's summary judgment motion at the lower court, and we also brought this up in our opening brief before the hearing. And what we found before this court is that the Plyler v. Doe decision does speak to the issue of protected characteristics or protected trait of aliens and illegal aliens. And that's why at the district court I took so much time to create these, to analyze exactly what it is that we were talking about here in terms of how this policy applies, and really that alien edge is the most relevant consideration there. For the very reason that when we're talking about national origin, I fall more in line with the Espinoza line of view that there needs to be something more pointed, more critical than just not saying national origin discrimination arises from not being, not originating from one country. It has to do more with the country from which you actually originate. The other point that I would like to make is that with respect to the false imprisonment claim, that there can only be one claim in that complaint that speaks to vicarious liability. And I lay that out in my opening brief, and I just want to highlight that here very briefly, because the fundamental question is whether this is a vicarious liability claim or a direct liability claim. And the complaint contains language saying that plaintiff bases all applicable and appropriate claims on the doctrine of respondeat superior vicarious liability. Well, there's really only one claim that can be based on vicarious liability, because of the fact that we're talking about other Federal claims based on Section 1983. Really, there's only one. And if this Court finds that the district court made an error by even finding a false imprisonment claim premised on direct liability, then Anoka County's Rule 50 motion should have been granted and reversal would be appropriate. All right.